UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-20854-JEM

UNITED STATES OF AMERICA,

v.

GILBERT FIORENTINO,

      Defendant.

_____/

## AMENDED PLEA AGREEMENT

The United States of America and Gilbert Fiorentino (hereinafter "defendant") enter into the following agreement:

1.     The defendant understands that he has the right to have the evidence and charges against him presented to a federal grand jury for determination of whether or not there is probable cause to believe he committed the offenses with which he is charged.  Understanding this right, and after full and complete consultation with his counsel, the defendant agrees to waive in open court his right to prosecution by indictment and agrees that the United States may proceed by way of an Information to be filed pursuant to Rule 7 of the Federal Rules of Criminal Procedure.

2.     The defendant agrees to plead guilty to an Information to be filed in the future, that will charge the defendant with one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, with two objects, that is: (1) false statements to auditors, in violation of Title 15, United States Code, Sections 78m(b) and 78ff(a); and Title 17, Code of Federal Regulations, Section 240.13b2-2; and, (2) impeding,

(Exhibit)

impairing, obstructing, and defeating the lawful governmental functions of the IRS, in the ascertainment, computation, assessment, and collection of federal income taxes. In exchange for defendant's agreement to plead guilty, and for fulfilling all of his other obligations set forth in the Plea Agreement, and subject to the limitations and provisions set forth in this Agreement, the Office of the United States Attorney for the Southern District of Florida and the Office of the United States Attorney for the Eastern District of New York (hereinafter, collectively "Office"), agrees not to prosecute defendant for any other offenses arising out of the conduct described in paragraph 18 below. This Agreement includes only the conduct set forth in paragraph 18 below, and excludes crimes of violence, any other conduct not set forth in paragraph 18 below, and any other proceeding or investigation which may be pending at the time this Agreement is signed. This Agreement is also limited to this Office, and as such, does not and cannot bind other federal, state, regulatory, or local prosecuting authorities.

3.      The defendant is aware that the sentence will be imposed by the Court after considering the Federal Sentencing Guidelines and Policy Statements (hereinafter "Sentencing Guidelines"). The defendant acknowledges and understands that the Court will compute an advisory sentence under the Sentencing Guidelines and that the applicable guidelines will be determined by the Court relying in part on the results of a Pre-Sentence Investigation by the court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the Court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the Court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the Court is permitted to



tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines' advisory sentence. Knowing these facts, the defendant understands and acknowledges that the Court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 2, and that the defendant may not withdraw the plea solely as a result of the sentence imposed.

4.      The defendant also understands and acknowledges that the Court may impose a statutory maximum term of imprisonment of up to five (5) years for the Information as to Count One, followed by a term of supervised release of up to three (3) years. In addition to a term of imprisonment and supervised release, the Court may impose a fine of up to $250,000 or double the gross proceeds, and must order restitution. The defendant agrees that he will make restitution in an amount determined by the Court and as set forth in paragraph 5 of this Agreement. The defendant understands and agrees that the government and any victim may provide evidence to the Court for the purpose of a determination as to restitution. The parties further agree that the defendant will pay a fine at the mid-range of the Fine Table as set forth in U.S.S.G. § 5E1.2 for the offense level applicable to defendant as calculated by the Probation Office.

5.      The defendant agrees to sign a Form 906, Closing Agreement, with the IRS prior to the date of sentencing for the tax years 2006 through 2011. Further, the defendant will provide the IRS with any and all information requested by the IRS regarding the years covered by the Closing Agreement. The defendant previously submitted a payment to the IRS on October 15, 2012 in the amount of $196,254. The defendant further agrees to pay and will promptly pay in full the remaining liability for additional income taxes, penalties and interest as determined by or resulting from the provisions of the Closing Agreement for the tax years 2006



through 2011 as well as any additional amounts determined by the IRS prior to the date of sentencing. The parties understand the defendant will receive proper credit for the payment submitted to the IRS on November 25, 2013 pursuant to the terms of this agreement. Except as set forth in the previous sentence, nothing in this agreement shall limit the IRS in its lawful examination, determination, assessment, or collection of any taxes, penalties or interest due from the defendant for the time period(s) covered by this agreement or any other time period. The defendant agrees that the taxes due and owing to the IRS, excluding interest and penalties, for the tax years 2006 through 2011 are, at least, as follows:

| Form Year | Unreported Income | Tax Loss Amount |
|-----------|-------------------|-----------------|
| 2006 | $ 38,000 | $ 13,300.00 |
| 2007 | $ 55,000 | $ 19,250.00 |
| 2008 | $ 73,050 | $ 25,567.50 |
| 2009 | $245,825.84 | $ 86,039.04 |
| 2010 | $ 79,769.21 | $ 27,919.22 |
| 2011 | $ 20,594.15 | $  7,207.95 |
| **Total:** | **$512,239.20** | **$179,283.71** |

Nothing in this agreement shall limit the IRS in its civil determination, assessment, and collection of any taxes, interest, and/or penalties that the defendant may owe.

6.     The defendant also understands and acknowledges that forfeiture shall be imposed by the Court as part of defendant's sentence. The defendant agrees that he shall assist the United States in all proceedings, whether administrative or judicial, involving the forfeiture to the United States of all right, title, and interest, regardless of their nature or form, in all assets, including real or personal property, cash or other monetary instruments, wherever located, which the defendant or others to his knowledge have accumulated as a result of the defendant's illegal activities. The defendant further agrees to forfeit to the United States voluntarily and immediately all of his right, title and interest in all funds that, pursuant to Title 18, United States

4



Code, Section 981(a)(1)(C), constitute or are derived from proceeds the defendant obtained, directly or indirectly as a result of the unlawful activity as set forth in the Information, or is property traceable to such property. Such property specifically includes 99 gold coins that were received by the defendant as kickbacks as part of the charged conduct. Additionally, defendant agrees to identify as being subject to civil forfeiture all such assets, and assist in the transfer of such property to this Office or the Federal Bureau of Investigation, as directed, all necessary and appropriate documentation with respect to said assets, including consents to forfeiture, quit claim deeds and any and all other documents necessary to deliver good and marketable title to said property.

7.      The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 4 and paragraph 6 of this Agreement, a special assessment in the amount of $100 will be imposed on the defendant. The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.

8.      The Office reserves the right to inform the Court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant's background. Subject only to the express terms of any agreed-upon sentencing recommendations contained in this Agreement, the Office further reserves the right to make any recommendation as to the quality and quantity of punishment.

9.      The United States agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant's offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant's recognition and affirmative and timely acceptance of personal responsibility. If at the time of

5



sentencing the defendant's offense level is determined to be 16 or greater, the government will make a motion requesting an additional one level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. The United States, however, will not be required to make these recommendations if the defendant: (1) fails to fulfill all of his obligations under this Amended Plea Agreement; (2) fails or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (3) is found to have misrepresented facts to the government prior to entering into this Amended Plea Agreement; or (4) commits any misconduct after entering into this Amended Plea Agreement, including but not limited to committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

10.     The Office and the defendant agree that, although not binding on the probation office or the Court, they will jointly recommend that the Court make the following findings and conclusions as to the sentence to be imposed on the count to which the defendant shall plead:

a.     <u>Applicable Guideline Offense and Base Offense Level</u>:

Pursuant to Section 2B1.1 of the Sentencing Guidelines, the offense guideline applicable to Count One, the base offense level is 6.

b.     <u>Specific Offense Characteristics</u>:

The parties agree and stipulate that the following offense characteristics apply: (1) The offense loss was more than $20,000,000 but not more than

6



$50,000,000, resulting in an increase of 22 levels under Section 2B1.1(b)(1)(H); (2) the defendant was an officer or a director of a publicly traded company, resulting in an increase of 4 levels under Section 2B1.1(b)(19)(A); and, the offense involved sophisticated means, resulting in an increase of 2 levels under Section 2B1.1(b)(10)(C).[1]

11.     The defendant is aware that the sentence has not yet been determined by the Court. The defendant also is aware that any estimate of the probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court. The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this Agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety. The defendant understands and acknowledges, as previously acknowledged in paragraph 3 above, that the defendant may not withdraw his plea based upon the court's decision not to accept a sentencing recommendation made by the defendant, the government, or a recommendation made jointly by both the defendant and the government.

12.     The defendant agrees that he shall cooperate fully with this Office by, among other things: (a) providing truthful and complete information and testimony, and producing documents, records and other evidence, when called upon by this Office, whether in interviews,

---

[1] The parties acknowledge that pursuant to U.S.S.G. § 2T1.9, reference to § 2T1.1 would apply to the tax object of the conspiracy charged in Count One; the base offense level derived from the tax loss would be more than $80,000 but not more than $200,000, for an offense level of 16 under the § 2T4.1 Tax Table; and, that an offense characteristic of plus two would apply under § 2T1.1(b)(1) as the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity. Therefore, under § 2T1.9, for the tax object of the conspiracy charged in Count One, the parties agree to a total offense level of 18. Under § 2B1.1, the guideline applicable for the fraud object of the conspiracy charged in Count One, the parties agree to a total offense level of 34. Understanding that this is not binding on the Court, the parties agree that under § 3D1.2, the total offense level for Count One would be 34, before any reduction for acceptance of responsibility or any variance.

7



before a grand jury, or at any trial or other court proceeding; (b) appearing at such grand jury proceedings, hearings, trials, and other judicial proceedings, and at meetings, as may be required by this Office; and (c) if requested by this Office, working in an undercover role under the supervision of, and in compliance with, law enforcement officers and agents.

13.     The Office reserves the right to evaluate the nature and extent of the defendant's cooperation and to make the defendant's cooperation, or lack thereof, known to the Court at the time of sentencing. If in the *sole and unreviewable judgment* of this Office the defendant's cooperation is of such quality and significance to the investigation or prosecution of other criminal matters as to warrant the court's downward departure from *the advisory sentence* calculated under the Sentencing Guidelines, this Office may at or before sentencing make a motion consistent with the intent of Section 5K1.1 of the Sentencing Guidelines prior to sentencing, or Rule 35 of the Federal Rules of Criminal Procedure subsequent to sentencing, reflecting that the defendant has provided substantial assistance and recommending that the defendant's sentence be reduced from the advisory sentence suggested by the Sentencing Guidelines. The defendant acknowledges and agrees, however, that nothing in this Agreement may be construed to require this Office to file any such motion(s) and that this Office's assessment of the nature, value, truthfulness, completeness, and accuracy of the defendant's cooperation shall be binding insofar as the appropriateness of this Office's filing of any such motion is concerned.

14.     The defendant understands and acknowledges that the Court is under no obligation to grant the motion(s) referred to in this Agreement should the government exercise its discretion to file any such motion. The defendant also understands and acknowledges that the



Court is under no obligation to reduce the defendant's sentence because of the defendant's cooperation.

15.    The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, and in exchange for the undertakings made by this Office in this Amended Plea Agreement, the defendant hereby waives all rights conferred by Title 18, United States Code, Section 3742 to appeal the conviction, any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure from the guideline range that the Court establishes at sentencing. The defendant further understands that nothing in this Agreement shall affect this Office's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b). However, if this Office appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this Agreement, the defendant acknowledges that he has discussed the appeal waiver set forth in this Agreement with his attorney. The defendant further agrees, together with this Office, to request that the district court enter a specific finding that the defendant's waiver of his right to appeal the conviction or sentence to be imposed in this case was knowing and voluntary.

16.    In the event the defendant withdraws from this Agreement prior to pleading guilty or breaches the Agreement before or after he pleads guilty to the charges identified in paragraph two (2) above or otherwise fails to fully comply with any of the terms of this Amended Plea Agreement, this Office will be released from its obligations under this Agreement, and the defendant agrees and understands that: (a) the defendant thereby waives any protection afforded by any proffer letter agreements between the parties, Section 1B1.8 of the Sentencing

Guidelines, Rule 11(f) of the Federal Rules of Criminal Procedure, and Rule 410 of the Federal Rules of Evidence, and that any statements made by the defendant as part of plea discussions, any debriefings or interviews, or in this Agreement, whether made prior to or after the execution of this Agreement, will be admissible against the defendant without any limitation in any civil or criminal proceeding brought by the government; and (b) the defendant stipulates to the admissibility and authenticity, in any case brought by the United States in any way related to the facts referred to in this Agreement, of any documents provided by the defendant or the defendant's representatives to any state or federal agency and/or this Office.

17.     The defendant recognizes that pleading guilty may have consequences with respect to the defendant's immigration status, if the defendant is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, and, in some cases, removal is presumptively mandatory.  Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including the defendant's attorney or the district court, can predict to a certainty the effect of the defendant's conviction on the defendant's immigration status.  The defendant nevertheless affirms the desire to plead guilty regardless of any immigration consequences that the plea may entail, even if the consequence is automatic removal from the United States.

18.     The defendant hereby (i) confirms that he has reviewed the following facts with legal counsel, (ii) adopts the following factual summary as his own statement, (iii) agrees that the following facts are true and correct, and (iv) stipulates that the following facts provide a sufficient factual basis for the plea of guilty in this case, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure:



## A.      Introduction

From in or around January 2005 through in or around January 2011, in the Southern District of Florida and elsewhere, defendant Gilbert Fiorentino ("defendant" or "Fiorentino") conspired with others, including his brother Carl Fiorentino, to receive undocumented compensation in the form of cash payments and the receipt of goods and services, which compensation was not disclosed to his employer, Systemax, Inc. ("Systemax"), or to its outside auditors and investors.  In so doing, Fiorentino caused the falsification of the books and records of Systemax, and specifically made and caused to be made false and misleading statements in connection with the audit, review and examination of the financial statements of Systemax by its outside auditors.

Fiorentino also conspired with others to conceal the existence of this undocumented compensation from the Internal Revenue Service ("IRS") in order to impede and obstruct the lawful functions of the IRS, in the ascertainment, computation, assessment, and collection of federal income taxes, and specifically the compensation of Fiorentino during the period of the conspiracy.

## B.      Defendant was a Director and Senior Executive of Systemax

Fiorentino was a director of Systemax and was the chief executive of its Technology Products Group.  Fiorentino lived in Miami, Florida and worked at Systemax's Miami offices.  Systemax was a Fortune 1000 company that sold personal computers and other electronics through websites, retail stores and direct mail catalogs.   Systemax conducted business under several brand names, including Tiger Direct, CompUSA and Circuit City.

Between 2005 and 2011, Fiorentino received in excess of $600,000 from one or more persons and entities that conducted business with Systemax and in goods and assets of Systemax that he misappropriated, and which he failed to disclose to Systemax and its auditors.  Fiorentino misappropriated merchandise and assets from Systemax, estimated to be worth more than $100,000, which he also failed to disclose to Systemax and its auditors.  As a result of Fiorentino's actions, Systemax materially understated his compensation and failed to disclose his personal financial interest in certain related party transactions in its proxy statements, which were incorporated by reference in Systemax's Forms 10-K that were required to be filed with the U.S. Securities and Exchange Commission ("SEC").  Fiorentino reviewed and signed each Systemax Form 10-K from fiscal year 2005 through 2010, knowing the Forms 10-K failed to make the required disclosures.

## C.      Receipt of Undisclosed Payments, Goods and Services

During the period of the conspiracy, Fiorentino received undisclosed payments from various vendors or external service providers who conducted

business with Systemax. For example, from approximately 2005 through approximately 2009, Fiorentino paid to GT in excess of a hundred thousand dollars in the form of misappropriated merchandise and assets from Systemax, in exchange for GT providing upkeep for Fiorentino's yacht. In another example, from approximately 2006 through approximately 2011, Fiorentino received from vendor WB, more than two hundred thousand dollars worth of cash and other payments. Some of these monies were provided personally to Fiorentino at the Miami offices of Systemax or during clandestine meetings in the office parking lot. WB was a significant vendor who provided certain goods and services involving packaging of the products sold by Systemax. In yet another example, from approximately 2009 through approximately 2010, individual WL, who conducted business with Systemax, agreed to the demands of Fiorentino to pay a percentage of his firm's business with Systemax directly to Fiorentino. So as to avoid the detection of such payments by others, WL made periodic and undisclosed payments to Fiorentino in the form of gold coins valued at approximately $200,000. In other examples, Fiorentino paid persons who provided goods and services to Fiorentino, with products that Fiorentino took from Systemax without authorization, and using other methods of payments derived from Systemax but that were undisclosed.

During the conspiracy, Systemax accrued a substantial number of American Express points that Fiorentino diverted to his personal benefit without disclosing this fact to the Board of Directors of Systemax or its outside auditors. Fiorentino was in a position to direct Systemax to make payments to certain Systemax vendors and for accounts payable, using a company account with American Express. Fiorentino caused the points that accrued from these corporate transactions to inure to the benefit of Fiorentino personally. By this arrangement, Fiorentino caused Systemax to engage in corporate transactions for which he obtained an undisclosed personal financial benefit.

Certain vendors, such as WB and WL referenced above, conducted business with Systemax spanning several years and were aware that the undisclosed and undocumented payments made to Fiorentino were not reported to Systemax or as income to the IRS.

### D. Kickbacks Involving RICI and Carl Fiorentino

In approximately 2003, Fiorentino, along with his brother Carl Fiorentino, caused Systemax to form a new business relationship with a Taiwan-based supplier, RICI International and its affiliated companies, Top Supreme and Coaster Associates (collectively "RICI"). Prior to 2003, RICI had no real business at all, but during the period 2003 through 2011, RICI sold more than $150 million worth of computer and electronics goods and materials to Systemax.

After the business relationship between Systemax and RICI began, Fiorentino and his brother Carl Fiorentino received kickbacks from the principal



of RICI, E.K. The kickbacks to Gilbert Fiorentino included cash payments, the receipt of funds that were used to purchase a boat, a payment to a third party who provided custom furniture to Gilbert Fiorentino, and gift cards.

Between 2003 and 2011, Gilbert Fiorentino was aware that RICI and E.K. made payments to his brother Carl Fiorentino. While Gilbert was not aware of the exact amount of such kickbacks, he avoided learning the amount and did not stop this practice from continuing. Gilbert Fiorentino also was the supervisor of his brother, Carl Fiorentino, from at least 2004 through 2011.

Gilbert Fiorentino concealed the payments he and his brother Carl Fiorentino received from RICI and E.K., from Systemax and its auditors, and caused Systemax to pay more for such goods and services than it would have paid but for the kickback scheme involving RICI, E.K., and his brother Carl Fiorentino.

### E.   Periodic Securities Filings By Systemax Required Disclosure of Fiorentino's Compensation and Any Related Party Transaction

As part of its compliance with Section 404 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7262, Systemax required certain management personnel, including Fiorentino, to sign annual conflict of interest questionnaires, certifications of compliance with the Company's corporate ethics policy, and representations about transactions out of the course of ordinary business. Fiorentino signed each of these documents for the fiscal years 2007 through 2010.

In completing the conflict of interest questionnaires, Fiorentino falsely represented he did not "[r]eceive or make any arrangements for the receipt of any compensation or other personal financial benefit from a current or potential supplier, competitor or customer of the Company." By signing the certifications of compliance with the Company's corporate ethics policy, Fiorentino falsely represented he had not used "[c]ompany property, information, or [his] position for personal gain…" and had "compl[ied] with internal controls and procedures of the Company that are intended to allow for better management and protection of the Company's assets."

Additionally, Fiorentino routinely signed management representation letters to the Company's independent auditors from at least June 2006 until at least May 13, 2010 that stated: "We have no knowledge of any fraud or suspected fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting…." Furthermore, all of the management representation letters Fiorentino signed, like the Company's internal conflict of interest questionnaires, contained a statement that no officer of the Company had a business interest in conflict with the Company and that such an interest would be contrary to Company policy.



Because Fiorentino was one of Systemax's highest compensated executives, the securities laws required Systemax to disclose all compensation he received each fiscal year. Perquisites and other personal benefits, or property, unless the aggregate amount of such compensation was less than $10,000, were required to be disclosed pursuant to Item 402(c) of Regulation S-K, 17 C.F.R. § 229.402(c)(2)(ix). In addition, Item 404(a) of Regulation S-K, 17 C.F.R. § 229.404(a), required a description of any transaction or series of similar transactions exceeding $120,000 (adjusted upward from $60,000 as of December 15, 2006) in which the issuer was a party and in which any director, executive officer, or any member of their immediate families had a direct or indirect material interest. Systemax's Form 10-K and proxy statement were required to provide this disclosure.

Fiorentino received personal benefits and compensation in excess of $10,000 from entities that engaged in transactions with Systemax that exceeded $120,000, each year from 2006 through 2010, as set forth above. However, Fiorentino did not disclose this additional compensation or his interest in those transactions to Systemax or its independent auditors. As a result of the undisclosed compensation Fiorentino received, Systemax did not disclose this information in its proxy statements or Forms 10-K for the years 2006 through 2010.

Fiorentino, as a director of Systemax, reviewed and signed the Company's Forms 10-K for each of the fiscal years 2006 through 2010 even though he knew the incorporated proxy statements materially understated his compensation and failed to disclose his financial interest in certain related party transactions.

### F.    Concealment of Income from IRS

During the period of the conspiracy referenced herein, Fiorentino filed and caused to be filed certain tax returns and other tax-related forms and documents, including IRS Forms 1040 and 1099-MISC. Fiorentino and his conspirators, including conspirators WB and WL referenced above, knowingly and wilfully concealed from others and the IRS the compensation paid to Fiorentino. Among other things, the conspirators caused such compensation to be paid to Fiorentino in the form of cash, gold coins and other income, so that the compensation would not be detected by others or reported on Forms 1040 and 1099-MISC or otherwise. Fiorentino and his conspirators thereby prevented and hindered the IRS from being able to ascertain, retrieve or collect payment of the correct tax due and owing and from imposing penalties and prohibitions against the defendant and his conspirators who were responsible for such conduct. The tax loss associated with this conduct was more than $80,000 but not more than $200,000.[1]

---

[1]     I, Gilbert Fiorentino, after having completed plea negotiations and having reached a plea agreement with the United States, hereby affirm that I understand the foregoing and voluntarily and



19.   This Office represents that the undersigned prosecutors are unaware of any information establishing the factual innocence of the defendant in the offenses referred to in paragraph two of this Agreement.  This Office understands it has a continuing duty to provide such information establishing factual innocence of the defendant. The defendant understands that if this case proceeded to trial, this Office would be required to provide impeachment information relating to any informants or other witnesses.  In addition, if the defendant raised an affirmative defense, this Office would be required to provide information in its possession that supports such a defense.  Further, if this case proceeded to trial, this Office would be required to provide other information and materials in accordance with Fed. R. Crim. P. 16 and the Southern District of Florida's Standing Discovery Order.  In return for the Government's promises set forth in this Agreement, the defendant waives the right to receive in discovery any such information and materials other than information and materials establishing the factual innocence of the defendant, and agrees not to attempt to withdraw the guilty plea or to file a collateral attack based on the existence of such information and materials other than information and materials establishing the factual innocence of the defendant.

20.   This Office agrees that it will not seek additional upward specific offense characteristics, enhancements, or upward departures to or from the defendant's offense level beyond those, if any, specifically referred to in this Agreement, except that this Office shall have the right in its discretion to seek additional upward specific offense characteristics,

knowingly adopt the Factual Basis set forth in paragraph 18 as my own statement.  This statement is intended to be a post-plea discussion statement and is not protected by Criminal Procedure Rule 11(e)(6) or Federal Rule of Evidence 410.  No promises or inducements have been made to me other than those contained in this agreement.  I am satisfied with the representation of my attorney in this matter. Defendant _____ and Defense Counsel _____

15



enhancements, or upward departures to or from the defendant's offense level beyond those, if any, specifically referred to in this Agreement where any such additional upward specific offense characteristics, enhancements, or upward departures to or from the defendant's offense level would be based on conduct occurring after the defendant enters into this Agreement. The defendant agrees that he will be sentenced under the Sentencing Guidelines. Defendant may argue for a variance to the sentencing guideline range but only for a variance from the range as calculated in this Amended Plea Agreement. In the event the probation office recommends any sentencing enhancements or characteristics that result in a calculation greater than those set forth in this Amended Plea Agreement, the defendant may oppose such enhancements.

21.     This Amended Plea Agreement between the parties is the entire agreement and understanding between the United States of America and the defendant and supersedes any and all prior agreements. There are no other agreements, promises, representations, or understandings.

WIFREDO A. FERRER
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

Date: 12/2/14                    By: _____
                                       JERROB DUFFY
                                       ASSISTANT UNITED STATES ATTORNEY

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

Date: 12/2/14                    By: _____
                                       WHITMAN G.S. KNAPP
                                       ASSISTANT UNITED STATES ATTORNEY

16



Date: 10\15\14

By: _____
RYAN DWIGHT O'QUINN, ESQ.    Sam Rabin
ATTORNEY FOR DEFENDANT

Date: _____

By: _____
DANIEL GELBER, ESQ.
ATTORNEY FOR DEFENDANT

Date: 10|15|14

By: _____
GILBERT FIORENTINO
DEFENDANT

17

